UNITED STATES DISTRICT COURT
MIDDLE DISTRICT OF TENNESSEE
NASHVILLE DIVISION

| | |
|---|---|
| AMERICAN FEDERATION OF MUSICIANS OF THE UNITED STATES AND CANADA, AFL-CIO, </br></br>Plaintiff,</br></br>v.</br></br>RURAL MEDIA GROUP, INC., and RFD-TV, LLC,</br></br>Defendants. | Case No. 3:20-cv-00318</br>Judge Aleta A. Trauger |

## MEMORANDUM & ORDER

Rural Media Group, Inc. ("RMG") and RFD-TV, LLC ("RFD") have filed a Motion to Dismiss (Doc. No. 37), to which the American Federation of Musicians of the United States and Canada, AFL-CIO ("AFM") has filed a Response (Doc. No. 41), and RMG and RFD have filed a Reply (Doc. No. 43). For the reasons set out herein, the motion will be granted in part and denied in part.

## I. BACKGROUND[1]

AFM is a union representing instrumental musicians throughout North America. (Doc. No. 34 ¶ 1.) Among the workers represented by AFM are musicians who perform on two television programs, Ray Stevens CabaRay Nashville and The Marty Stuart Show. Ray Stevens CabaRay Nashville is produced by Ray Stevens Productions, LLC ("Stevens LLC"), which is a signatory employer to an AFM collective bargaining agreement, or "CBA," known as the National Public Television ("NPT") Agreement. The Marty Stuart Show is produced by Marty Stuart Tours, LLC

---

[1] Except where otherwise indicated, the facts set forth are from the plaintiff's First Amended Complaint (Doc. No. 34) and are accepted as true for the purposes of the Motion to Dismiss.

("MST"), which is a signatory employer to another AFM CBA, the Basic Cable Agreement. (*Id.* ¶¶ 6–8.)

RMG and RFD are companies that own and/or operate television stations. Both companies are controlled by Patrick Gottsch. (*Id.* ¶¶ 14, 22, 64.) RMG has entered into a program license agreement with Stevens LLC that gives RMG the exclusive right to air rebroadcasts of Ray Stevens CabaRay Nashville. Pursuant to that license, RMG agreed that it would be responsible for payment of all union or guild fees, residuals, or other payments to any union or guild arising from RMG's use of the episodes. (*Id.* ¶ 22; Doc. No. 38-2 at 6–7.) The licensing contract between RMG and Stevens LLC, however, includes a "No Benefits to Others" provision, stating that "[t]he representations, warranties, covenants, obligations, and agreements contained in this Agreement are for the sole benefit of the parties hereto and their respective successors and permitted assigns, and they shall not be construed as conferring and are not intended to confer any rights on any other persons." (Doc. No. 38-2 at 10.) Since licensing the program, RMG has aired Ray Stevens CabaRay episodes, and each such airing, AFM claims, has entitled AFM to payment on behalf of its members under the NPT Agreement. RMG did pay AFM for its use of the program once, but it has since refused to make any further payments. (Doc. No. 34 ¶¶ 24–26.)

The situation with RFD is similar. RFD is party to an exclusive program license agreement with MST to air rebroadcasts of The Marty Stuart Show. AFM takes the position that, under the program license agreement, RFD has assumed the responsibility of paying the relevant AFM musicians the money owed to them based on each broadcast of the program pursuant to the Basic Cable Agreement. RFD did pay AFM under the License Agreement, not just once, but for several years. It has, however, since refused to do so, leaving the musicians unpaid for RFD's ongoing airing of the Marty Stuart Show. (*Id.* ¶¶ 14–21; Doc. No. 38-1 at 4.) The agreement between MST

and RFD, like the agreement between RMG and Stevens LLC, includes a provision disclaiming the existence of any third-party beneficiaries: "No Third Party Beneficiaries. This Agreement shall not confer any rights or remedies upon any person other than the parties hereto and their permitted successors and assigns, and only in accordance with the express terms of this Agreement." (Doc. No. 38-1 at 12.)

On April 14, 2020, AFM filed a Complaint against RMG and RFD in this court. (Doc. No.1.) On August 21, 2020, AFM filed a First Amended Complaint. (Doc. No. 34.) AFM pleads five causes of action. Count I is for violations of the Digital Millennium Copyright Act ("DMCA"), 28 U.S.C. § 4001. Specifically, AFM alleges that, under the DMCA, the defendants' purchase of the rights to air the respective television programs also carried with it an assumption of the underlying collective bargaining agreement obligations, which the defendants have failed to honor. (*Id.* ¶¶ 29–35.) Count II is for violations of the Labor Management Relations Act ("LMRA"), 29 U.S.C. § 185, also based on the alleged violations of the CBAs. (*Id.* ¶¶ 36–45.) Count III is for breach of contract, namely, the program license agreements, to which AFM claims to be an intended third-party beneficiary. (*Id.* ¶¶ 46–52.) Count IV is a claim for unjust enrichment, should the defendants' failures to pay be found to be inequitable but not in violation of any particular contract. (*Id.* ¶¶ 53–59.) Count V is a claim for "estoppel," based on AFM's reliance on the defendants' representations. (*Id.* ¶¶ 60–68.)

On September 4, 2020, the defendants filed a Motion to Dismiss, arguing that the court should dismiss AFM's LMRA, breach of contract, unjust enrichment, and estoppel claims—that is, Counts II through V. (Doc. No. 37.) The defendants argue that their relationships with AFM are not governed by the LMRA and that, in the alternative, if those relationships are governed by the LMRA, then the LMRA preempts AFM's common law claims. The defendants also argue that

3

some of the common law claims should fail as a matter of law, regardless of preemption. (*Id.* at 1–2.)

## II. LEGAL STANDARD

In deciding a motion to dismiss for failure to state a claim under Rule 12(b)(6), the court will "construe the complaint in the light most favorable to the plaintiff, accept its allegations as true, and draw all reasonable inferences in favor of the plaintiff." *Directv, Inc. v. Treesh*, 487 F.3d 471, 476 (6th Cir. 2007); *Inge v. Rock Fin. Corp.*, 281 F.3d 613, 619 (6th Cir. 2002). The Federal Rules of Civil Procedure require only that the plaintiff provide "a short and plain statement of the claim that will give the defendant fair notice of what the plaintiff's claim is and the grounds upon which it rests." *Conley v. Gibson*, 355 U.S. 41, 47 (1957). The court must determine only whether "the claimant is entitled to offer evidence to support the claims," not whether the plaintiff can ultimately prove the facts alleged. *Swierkiewicz v. Sorema N.A.*, 534 U.S. 506, 511 (2002) (quoting *Scheuer v. Rhodes*, 416 U.S. 232, 236 (1974)).

The complaint's allegations, however, "must be enough to raise a right to relief above the speculative level." *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 555 (2007). To establish the "facial plausibility" required to "unlock the doors of discovery," the plaintiff cannot rely on "legal conclusions" or "[t]hreadbare recitals of the elements of a cause of action," but, instead, the plaintiff must plead "factual content that allows the court to draw the reasonable inference that the defendant is liable for the misconduct alleged." *Ashcroft v. Iqbal*, 556 U.S. 662, 678–79 (2009). "[O]nly a complaint that states a plausible claim for relief survives a motion to dismiss." *Id.* at 679; *Twombly*, 550 U.S. at 556.

4

### III. ANALYSIS

### A. Whether the LMRA Applies

"The purpose of the LMRA is to allow unions and employers to enter collective bargaining agreements and to bind employees"—along with the employer and the union—"to the agreement's provisions." *Apperson v. Fleet Carrier Corp.*, 866 F.2d 431 (table), 1989 WL 4165, at *2 (6th Cir. 1989). Section 301 of the LMRA states that "[s]uits for violation of contracts between an employer and a labor organization representing employees in an industry affecting commerce as defined in this chapter . . . may be brought in any district court of the United States having jurisdiction of the parties, without respect to the amount in controversy or without regard to the citizenship of the parties." 29 U.S.C. § 185(a). There is no dispute, at least at this stage, that musicians represented by AFM were entitled to royalties under the relevant CBAs based on the rebroadcasts of the subject television shows. The defendants argue, however, that the LMRA would, at most, cover claims against Stevens LLC and MST—the companies that signed the CBAs and employed the AFM members. The defendants argue that any claim against the station owners themselves, insofar as such a claim would exist, would have to be a creature of ordinary, non-LMRA law—such as the law of contract.

As AFM points out, however, there is no categorical rule that only signatory employers may be sued under the LMRA. Certainly, the relationship between the signatory employer and the union-represented employee could be fairly characterized as the central concern of the Act. Nevertheless, other relationships may fall within the scope of the LMRA, if they are sufficiently bound up with that core subject matter. *Cf. John Wiley & Sons, Inc. v. Livingston*, 376 U.S. 543, 550 (1964) ("While the principles of law governing ordinary contracts would not bind to a contract an unconsenting successor to a contracting party, a collective bargaining agreement is not an

5

ordinary contract." (footnote omitted) (citing *United Steelworkers of Am. v. Warrior & Gulf Nav. Co.*, 363 U.S. 574, 578 (1960)). For example, "[t]he Sixth Circuit has explicitly stated that . . . a joint employer is liable . . . under a CBA signed by its co-joint employer," despite that employer's non-signatory status. *Cent. States, Se. & Sw. Areas Pension Fund v. Int'l Comfort Prod., LLC*, 787 F. Supp. 2d 696, 701 (M.D. Tenn. 2011) (citing *Metro. Detroit Bricklayers Dist. Council v. J.E. Hoetger & Co.*, 672 F.2d 580, 583–84 (6th Cir. 1982)).

As relevant to this case, the DMCA "provides an additional mechanism by which a court may find that a non-signatory to a collective bargaining agreement assumed the contractual obligations set forth therein." *Screen Actors Guild, Inc. v. Smoke Tree Prods., LLC*, No. CV 09-1472 CBM (JCX), 2011 WL 13272696, at *7 (C.D. Cal. Jan. 6, 2011). Specifically,

> [i]n the case of a transfer of copyright ownership under United States law in a motion picture (as the terms "transfer of copyright ownership" and "motion picture" are defined in section 101 of title 17) that is produced subject to 1 or more collective bargaining agreements negotiated under the laws of the United States, if the transfer . . . is not limited to public performance rights, the transfer instrument shall be deemed to incorporate the assumption agreements applicable to the copyright ownership being transferred that are required by the applicable collective bargaining agreement, and the transferee shall be subject to the obligations under each such assumption agreement to make residual payments and provide related notices . . . , if . . . the transferee knows or has reason to know at the time of the transfer that such collective bargaining agreement was or will be applicable to the motion picture . . . .

28 U.S.C. § 4001(a)(1). In other words, if a motion picture[2] is made pursuant to a collective bargaining agreement, and the copyright of the work is later transferred to a third party—as the term "transfer" is used in the DMCA—then the recipient of the rights may, if the appropriate

---

[2] "'Motion pictures' are audiovisual works consisting of a series of related images which, when shown in succession, impart an impression of motion, together with accompanying sounds, if any." 17 U.S.C. § 101. The defendants have not disputed that episodes of a television program are motion pictures for copyright purposes.

6

requirements are met, stand in the shoes of the original signatory employer, despite that new copyright holder's not having been a signatory employer itself.

"A 'transfer of copyright ownership," for the purposes of the DMCA, "is an assignment, mortgage, exclusive license, or any other conveyance, alienation, or hypothecation of a copyright or of any of the exclusive rights comprised in a copyright, whether or not it is limited in time or place of effect, but not including a nonexclusive license." 17 U.S.C.§ 101. Accordingly, while "transfer" captures more than merely outright, total transfers of a party's complete rights in a work, it does not reach situations where, for example, the recipient has merely become a nonexclusive licensee, with the original owner retaining the right to license the work to others. The defendants do not dispute, at least for the present purposes, that the exclusive licenses at issue in this case were transfers of ownership, as that term is used under the DMCA.

The defendants also have not sought dismissal of AFM's Count I, which alleges that the defendants are liable to AFM pursuant to the DMCA. The defendants argue, however, that the DMCA should not be construed as expanding the scope of the parties subject to suit under the LMRA. Accordingly, in the defendants' view, a party that assumes the obligations of a collective bargaining agreement under the DMCA may be subject to a claim pursuant to that statute but would not be subject to the same claim, citing the same grievance and seeking the same relief, if characterized as arising under the LMRA. Any LMRA claim would only be permitted against the original employer, even if that employer had fully sold away its copyright rights and, with them, its ongoing ability to profit off of the subject work.

Neither party has identified any case thoroughly considering the interplay between the DMCA and the LMRA. The plain language of the DMCA, however, suggests that, if the necessary requirements are met, an exclusive licensee can be made the legal equivalent of an original

employer. The DMCA speaks in terms of enforcing "assumption agreements applicable to the copyright ownership being transferred that are required by the applicable collective bargaining agreement." 28 U.S.C. § 4001(a)(1). "Assumption" is "[t]he act of taking (esp. someone else's debt or other obligation) for or on oneself.'" ASSUMPTION, Black's Law Dictionary (11th ed. 2019). An assumption agreement, in turn, is an agreement "by which the transferee of an instrument agrees to assume an obligation of the transferor." ASSUMPTION CLAUSE, Black's Law Dictionary (11th ed. 2019). The transferee of the ownership of a copyright cannot truly assume the position of the transferor, under a CBA, unless the transferee also assumes the employer's status under the LMRA. There is nothing in the text or purpose of either the DMCA or LMRA that would favor an alternative interpretation. The court therefore holds that the defendants are subject to the LMRA, and Count II will not be dismissed.

## B. Preemption

"Since 1962, the Supreme Court has held that" the LMRA "preempts state law rules that substantially implicate the meaning of collective bargaining agreement terms." *DeCoe v. Gen. Motors Corp.*, 32 F.3d 212, 216 (6th Cir. 1994). As a result, "[a] suit in state court alleging a violation of a provision of a labor contract must be brought under [the LMRA] and be resolved by reference to federal law." *Id.* (quoting *Allis–Chalmers Corp. v. Lueck*, 471 U.S. 202, 210 (1985)). The defendants argue that, if AFM is correct that the LMRA covers its claims, then it necessarily follows that AFM's various state law causes of action must be dismissed as preempted by federal law.

The Sixth Circuit has put forth the following test for determining whether LMRA preemption applies to a particular state law cause of action:

> First, the district court must examine whether proof of the state law claim requires interpretation of collective bargaining agreement terms. *Terwilliger v. Greyhound*

> *Lines, Inc.*, 882 F.2d 1033, 1037 (6th Cir.1989), *cert. denied*, 495 U.S. 946 (1990). Second, the court must ascertain whether the right claimed by the plaintiff is created by the collective bargaining agreement or by state law. If the right both is borne of state law and does not invoke contract interpretation, then there is no preemption. However, if neither or only one criterion is satisfied, section 301 preemption is warranted. *Id. See also Smolarek v. Chrysler Corp.*, 879 F.2d 1326, 1331 (6th Cir.), *cert. denied*, 493 U.S. 992 (1989).

*DeCoe*, 32 F.3d at 216. Because AFM is seeking payments secured by the CBA (or equivalent payments from an equitable source, such as through the law of unjust enrichment), its various state law claims potentially implicate both grounds for finding preemption.

AFM does not dispute the general principles of LMRA preemption. AFM argues, however, that dismissing the claims now would be premature, given that it is still contested, as a legal and factual matter, whether the defendants assumed the CBA duties at issue in this case. AFM's argument is persuasive. Admittedly, the court has now resolved one of the core questions underlying the parties' disagreement: whether it is at least possible for a licensee to assume the role of an employer under the LMRA. It remains undecided, however, whether that actually happened here. The defendants' briefing in support of their Motion to Dismiss was devoted to a categorical argument regarding whether a claim under the LMRA can be raised against an entity that was not formally the signatory employer. The fact that that argument has failed does not establish that AFM will ultimately prevail in establishing that the defendants actually assumed obligations under the CBAs. And if the defendants did not assume any CBA duties as part of the exclusive licenses, then there may be no basis for applying the LMRA and finding preemption. Dismissing any state law claims solely based on a potential conflict with the LMRA, therefore, would be premature.

9

**C. Substance of Claims**

**1. Breach of Contract.** The defendants argue that AFM has failed to state a claim for breach of contract because it has not alleged any enforceable contract between it and either of the defendants or identified any contract that would be enforceable by AFM as a third-party beneficiary. In Tennessee, a claim for breach of contract has three essential elements: (1) the existence of an enforceable contract; (2) nonperformance amounting to a breach of that contract and (3) damages caused by the breach of contract. *Ingram v. Cendant Mobility Fin. Corp.*, 215 S.W.3d 367, 374 (Tenn. Ct. App. 2006). In order to satisfy the first element, AFM relies on the program license agreements between the defendants and, respectively, MST and Stevens LLC.

AFM concedes that neither it nor its members were original signatories of the program license agreements. AFM, however, advances two arguments for why it should be able to enforce the agreements regardless: first, that AFM and its members are third-party beneficiaries of the agreements; and, in the alternative, that MST and Stevens LLC assigned their rights under the agreements to AFM. With regard to the latter of those arguments, AFM seemingly concedes that it would be necessary to amend the complaint to fully allege such a claim. (Doc. No. 41 at 11 ("In the alternative, Plaintiff would ask that the Court permit it to amend the pleadings to allege that Marty Stuart Tours, LLC and Ray Stevens Productions, LLC . . . assigned Plaintiff their rights under these agreements and/or to amend and add a claim asserted directly by Marty Stuart Tours, LLC and Ray Stevens Productions, LLC.").)

To qualify as a third-party beneficiary under Tennessee law, a plaintiff must show that:

(1) The parties to the contract have not otherwise agreed;

(2) Recognition of a right to performance in the [third party] is appropriate to effectuate the intention of the parties; and

(3) The terms of the contract or the circumstances surrounding performance indicate that either:

(a) the performance of the promise will satisfy an obligation or discharge a duty owed by the promisee to the beneficiary; or

(b) the promisee intends to give the beneficiary the benefit of the promised performance.

*Wallis v. Brainerd Baptist Church*, 509 S.W.3d 886, 899 (Tenn. 2016); (quoting *Owner-Operator Indep. Drivers Ass'n v. Concord EFS, Inc.*, 59 S.W.3d 63, 70 (Tenn. 2001)). The defendants point out that both of the license agreements at issue expressly disclaim any intent to create third-party beneficiaries, negating the first and possibly the second requirement for finding such a beneficiary under Tennessee law.

AFM's only response to that argument is to suggest that the cited disclaimers are merely "boilerplate" and that a contrary intention by the parties might ultimately reveal itself. Under Tennessee law, however, "the literal meaning of the language," if "clear and unambiguous, . . . controls the outcome of contract disputes." *Planters Gin Co. v. Fed. Compress & Warehouse Co.*, 78 S.W.3d 885, 890 (Tenn. 2002). There is simply no plausible reading of the subject language that would support a holding that AFM or the musicians it represents were intended third-party beneficiaries of the license contracts. That is, moreover, unsurprising, given that, as AFM itself argues, the DMCA creates a framework for dealing with the enforcement of CBA rights associated with a transferred copyright-protected work, and that framework is built around assumption of duties under the original CBA by the recipient of the rights, not establishment of third-parry beneficiary status arising out of the later contract between the transferor and the recipient.

The court will not, at this stage, address the possibility that Stevens LLC and MST might have assigned their rights under the agreements to AFM. The operative complaint makes no such claim, and, while AFM mentions the possibility of amending that complaint, AFM has not filed

11

any motion in compliance with Local Rule 15.01's requirements for seeking to amend a pleading. Moreover, one of the possibilities that AFM has raised is that Stevens LLC and MST might wish to plead their own claims for breach, and it would be inappropriate to consider such an amendment unless those entities themselves come to the court making such a request. The court therefore will dismiss AFM's Count III, without prejudice to any future motion to amend, should AFM elect to file one, or any motion to intervene by another party.

**2. Estoppel.** The defendants argue that, although the First Amended Complaint includes a claim for "estoppel" in name, it actually "contains no factual allegations to support a claim for estoppel against RMG or RFD." (Doc. No. 38 at 16.) AFM responds that it has pleaded claims for promissory estoppel under both state and federal law, based on its reliance on the defendants' purported assurances that they would pay the royalties that they owed, when they had no intention of doing so.

Tennessee courts describe the doctrine of promissory estoppel as reflecting the principle that "[a] promise which the promisor should reasonably expect to induce action or forbearance of a definite and substantial character on the part of the promisee and which does induce such action or forbearance is binding if injustice can be avoided only by enforcement of the promise." *Alden v. Presley*, 637 S.W.2d 862, 864 (Tenn. 1982) (quoting Restatement (First) of Contracts § 90); *accord Kutite, LLC v. Excell Petroleum, LLC*, 780 F. App'x 254, 264 (6th Cir. 2019). Thus, to succeed on a claim, a plaintiff must show "(1) that a promise was made; (2) that the promise was unambiguous and not unenforceably vague; and (3) that they reasonably relied upon the promise to their detriment." *Chavez v. Broadway Elec. Serv. Corp.*, 245 S.W.3d 398, 404 (Tenn. Ct. App. 2007) (citations omitted). "Tennessee courts generally disfavor claims based upon promissory estoppel." *Holt v. Macy's Retail Holdings, Inc.*, 719 F. Supp.2d 903, 913 (W.D. Tenn. 2010)

12

(citations omitted); *see Shedd v. Gaylord Entm't Co.*, 118 S.W.3d 695, 699–700 (Tenn. Ct. App. 2003) ("[T]he Tennessee Supreme Court has . . . limit[ed] the application of promissory estoppel to 'exceptional cases . . . verging on actual fraud.' " (quoting *Baliles v. Cities Serv.*, 578 S.W.2d 621 (Tenn. 1979)).

In its Response, AFM clarifies that its is claims for promissory estoppel are based on the following paragraphs:

> 64. Patrick Gottsch, who controls and operates RMG and RFD, requested invoices from AFM, claiming he intended to pay the outstanding balance for broadcasted episodes of the Marty Stuart Show and Ray Stevens CabaRay Nashville. AFM repeatedly sent the requested invoices, but RFD and RMG failed to remit the required payments.
>
> 65. RFD and RMG intended for AFM and the instrumental musicians to rely on their representations that they would remit payments as required by the agreements described herein, with AFM and the instrumental musicians reasonably relying on the representations.
>
> 66. Unaware that RFD and RMG intended to not make payment, AFM delayed taking action against RFD and RMG to obtain the associated benefits for the instrumental musicians.
>
> 67. Reliance on representations of RFD and RMG by AFM was detrimental in that they either ceased payments or made partial payments and the instrumental musicians AFM represents have now lost the benefit of wages and pension contributions owed to them for broadcasts of the shows.

(Doc. No. 34 ¶¶ 64–67.) The cited portion of the First Amended Complaint does allege a clear misrepresentation: that RFD and RMG would pay the sums that they did not intend to pay. However, the only action or forbearance that AFM has identified that was performed in reliance on Gottsch's misrepresentations was that "AFM delayed taking action against RFD and RMG to obtain the associated benefits for the instrumental musicians." Whether AFM has adequately alleged a claim for promissory estoppel therefore depends on whether such a claim can be based solely on a plaintiff's delay in resorting to legal means to pursue payment of a debt.

13

The only case that AFM cites in support of such a theory is *Calabro v. Calabro*, 15 S.W.3d 873 (Tenn. Ct. App. 1999), in which the Tennessee Court of Appeals stated that a "[p]laintiff's forbearance in bringing a suit could easily be viewed as a detriment to the plaintiff and a benefit to the defendant." *Id.* at 877. That statement, however, was made in the context of whether forbearance in bringing a suit could be considered consideration under a contract, not necessarily whether it could support a claim for promissory estoppel. Although promissory estoppel was admittedly also an issue in *Calabro* as an alternative theory of liability, the defendants correctly point out that that case—which involved a plaintiff daughter who made her college decision based on her father's promise to financially support her education—included numerous potential actions in reliance that could support a promissory estoppel claim. The court, therefore, does not read *Calabro* as endorsing the theory that a plaintiff can allege promissory estoppel based solely on the fact that the plaintiff delayed filing suit to recover a sum because it was assured that payment would be forthcoming.

"When resolving an issue of state law," a federal court must "look to the final decisions of that state's highest court, and if there is no decision directly on point, then [it] must make an *Erie* guess[3] to determine how that court, if presented with the issue, would resolve it."[4] *In re Fair Fin. Co.*, 834 F.3d 651, 671 (6th Cir. 2016) (quoting *Conlin v. Mortg. Elec. Registration Sys., Inc.*, 714 F.3d 355, 358–59 (6th Cir. 2013)). Under Tennessee law, in order to have a claim for promissory estoppel, it is not enough to show that the plaintiff took *some* action based on the defendant's

---

[3] "*Erie* guess" refers to *Erie R.R. Co. v. Tompkins*, 304 U.S. 64 (1938).

[4] Accordingly, even if *Calabro* did announce the rule that AFM suggests, it would not necessarily be determinative. Although "[a] federal court should not disregard the decisions of intermediate appellate state courts" in its *Erie* analysis, the federal court may rule contrarily to an intermediate court's decision if "it is convinced by other persuasive data that the highest court of the state would decide otherwise." *Meridian Mut. Ins. Co. v. Kellman*, 197 F.3d 1178, 1181 (6th Cir. 1999) (citing *Commissioner v. Estate of Bosch*, 387 U.S. 456, 465 (1967)).

14

statement; rather, "the detriment suffered in reliance must be substantial in an economic sense." *Alden*, 637 S.W.2d at 864 ((quoting L. Simpson, Law of Contracts § 61 (2d ed. 1965)); *accord BiotronX, LLC v. Tech One Biomedical, LLC*, 465 F. Supp. 3d 797, 807 (M.D. Tenn. 2020) (Campbell, J.). The defendants' failure to pay what they allegedly owe, if the nonpayment *itself* were traceable to Gottsch's misstatements, would undoubtedly be a substantial economic detriment. That economic injury, however, was not caused by Gottsch's misrepresentations; Gottsch could have refused to pay whether he told the truth about it immediately or not. The only arguable loss attributable to the misrepresentations themselves was a slight delay in suing the defendants. If Gottsch had simply truthfully said that he would not pay, then the parties would still have ended up in litigation, just likely a bit earlier. It is doubtful that that is the type of substantial economic detriment envisioned by Tennessee caselaw.

Allowing a plaintiff to file a claim for promissory estoppel merely because it was delayed in filing a timely claim for payment under a different theory of liability would, moreover, ultimately be redundant, if not circular. A delay in seeking payment is only detrimental to the plaintiff if the payment is actually owed; otherwise, there is no harm in delaying the collection of the nonexistent debt. But if the debt is real and the payment is actually owed, then there is no need for the law to rely on a promissory estoppel theory in order to recover. The plaintiff could simply sue under the original cause of action (and seek prejudgment interest as part of its damages). The only cause of action for promissory estoppel that would be viable under AFM's proposed theory, therefore, would be a wholly unnecessary one. Given the disfavored status of promissory estoppel under Tennessee law and the lack of any allegation that would support the conclusion that the delay in this case was economically significant, the court doubts that Tennessee courts would

recognize such a claim. AFM's claim for state law promissory estoppel, therefore, will be dismissed.[5]

## IV. CONCLUSION

For the foregoing reasons, the defendants' Motion to Dismiss (Doc. No. 37) is hereby **GRANTED** in part and **DENIED** in part. AFM's state law claims for (1) breach of contract based on its status as a third-party beneficiary to program license agreements and (2) promissory estoppel are hereby **DISMISSED**. The initial case management conference is **RESET** for April 5, 2021, at 2:30.

It is so **ORDERED**.

ALETA A. TRAUGER
United States District Judge

---

[5] The defendants do not address AFM's argument that it has a distinct claim for estoppel under federal law. *See Blessing v. United Steel, Paper & Forestry, Rubber, Mfg., Energy, Allied Indus. & Serv. Workers Int'l Union*, 244 F. App'x 614, 621 (6th Cir. 2007) ("[T]he federal common law that has developed under the LMRA includes a claim for promissory estoppel."). The court, accordingly, will not make any determination regarding such a claim here, although the court notes that the elements for such a claim appear to be similar to those required for the corresponding state law claim, which the court is dismissing. *See id.*